# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# STATESVILLE DIVISION

Calvin Trull, as the representative of a class
of similarly situated persons, and on behalf
of the McCreary Modern, Inc. Employee
Stock Ownership Plan,

        Plaintiff,

    v.

McCreary Modern, Inc. and the Board of
Trustees of the McCreary Modern, Inc.
Employee Stock Ownership Plan,

        Defendants.

Case No._____

**CLASS ACTION COMPLAINT**

## NATURE OF THE ACTION

1. Plaintiff Calvin Trull ("Plaintiff"), as the representative of the Class described herein, and on behalf of the McCreary Modern, Inc. Employee Stock Ownership Plan (the "Plan"), brings this action pursuant to the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), against Defendants McCreary Modern, Inc. ("McCreary") and the Board of Trustees of the McCreary Modern, Inc. Employee Stock Ownership Plan ("Trustees") (collectively, "Defendants"). This case is about Defendants' failure to engage in a prudent process to select and monitor an appropriate reinvestment policy for stock dividends earned by the Plan. The foregoing violated Defendants' fiduciary duties under ERISA, 29 U.S.C. §§ 1104(a)(1) and 1105(a).

## PARTIES

2. The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A); a "defined contribution plan" as defined by 29 U.S.C. § 1002(34) (also known as an "individual account plan"); and an "employee stock ownership plan" as defined by 29 U.S.C. § 1007(d)(6). The Plan is sponsored by McCreary for the benefit of its employees.

3. Plaintiff Calvin "Tim" Trull is a natural person and a resident of Hickory, North Carolina. He participated in the Plan between 2019 and 2024. His account in the Plan consisted of McCreary stock and cash dividends. His distribution from the Plan would have been greater if Defendants had engaged in a prudent process to determine an appropriate reinvestment policy for the cash dividends allocated to his account.

4. Defendant McCreary is the sponsor and administrator of the Plan. In its capacity as the administrator of the Plan, McCreary has broad oversight powers with respect to how the Plan is managed, including the power to delegate responsibility for Plan investments. McCreary delegated to Defendant Trustees the discretion to consider, select, and execute all transactions and

investments involving Plan assets, including the reinvestment of cash dividends earned by the Plan. McCreary, through its board of directors, also appointed and had authority to remove individual Trustees. Based on its broad management and administration powers and actions with respect to the Plan, McCreary is a fiduciary of the Plan as defined by 29 U.S.C. §§ 1002(21)(A)(i) & (iii).

5.      Defendant Trustees is the Plan's governing board appointed by McCreary to manage Plan investments, including McCreary stock and any reinvestment of cash dividends earned by the Plan. Based on its authority to manage and dispose of Plan assets, the Trustees and its individual members are fiduciaries of the Plan as defined by 29 U.S.C. § 1002(21)(A)(i). On information and belief, the individual Trustees are senior officers and directors of McCreary.

## JURISDICTION AND VENUE

6.      Plaintiff brings this action pursuant to 29 U.S.C. §§ 1132(a)(2) and (3), which provide that a participant in an employee benefit plan may pursue a civil action on behalf of the plan to remedy violations of ERISA and obtain monetary and appropriate equitable relief.

7.      This case presents a federal question under ERISA and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

8.      Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because Defendants' violations of ERISA occurred in Newton, North Carolina where McCreary is located and where the Plan is administered.

## DEFENDANTS' VIOLATIONS OF ERISA

### History of the Plan and Treatment of Cash Dividends

9.      McCreary established the Plan in 2008 to provide a retirement benefit to employees in the form of partial ownership of McCreary, a private company. The McCreary family transferred 30% of McCreary's stock to the Plan, subject to a promissory note. As the promissory

note was paid down, shares of McCreary stock from the 30% block of shares held by the Plan were allocated to the accounts of individual employees in the Plan.

10.     In December 2015, the promissory note was paid in full, and the entire 30% block of McCreary shares held by the Plan was allocated to the accounts of individual employees in the Plan.

11.     The allocated shares are subject to a five-year vesting schedule. As non-vested shares of departing employees are forfeited back to the Plan, those shares are re-allocated within the Plan to current employees, including to new employees who joined the company after 2015, such as Plaintiff.

12.     As of year-end 2023, there were more than 1,100 current and former McCreary workers with accounts in the Plan.[1]

13.     McCreary distributes profits to shareholders, including the Plan, in the form of cash dividends. Under the terms of the Plan, cash dividends are allocated to participants in the Plan and form part of each participant's total account value. Any proceeds of reinvesting cash dividends are likewise allocated to participants' accounts. When participants leave the Plan and receive a distribution of their account, they take with them all cash dividends and proceeds of cash dividends allocated to their account.

14.     Participants have no control regarding how their cash dividends are used or reinvested. The Trustees, subject to oversight by McCreary, exercise total discretion and control with respect to how to use and reinvest cash dividends on behalf of Plan participants.

15.     Between 2008 and 2015, Defendants used dividends received by the Plan to pay down the promissory note owed for the purchase of those shares, which expedited the allocation of

---

[1] The Plan's last annual report filed with the Department of Labor (DOL) was its 2023 annual report. The Plan's 2024 annual report is expected to be available in the second half of 2025.

the entire 30% block of shares to the accounts of individual McCreary employees. During this period, the proceeds of participants' cash dividends were more shares of McCreary stock. The Plan maintained a modest cash balance of no more than $1.3 million during this period.

16.     The company has continued to perform well since the promissory note was satisfied and has paid cash dividends to its shareholders every year. Because the promissory note was satisfied in full, Defendants have not been able to put cash dividends toward their former goal of allocating more stock to participant accounts. Instead, cash dividends have piled up in the Plan. The Plan has continuously held between $8 million and $16 million in excess cash since the start of 2019 as a result of unused cash dividends.

17.     Defendants failed to implement a prudent solution to this good problem. The Trustees failed to engage in a prudent process to investigate and implement an appropriate reinvestment policy for cash dividends, and failed to monitor the Plan's investment performance and opportunities throughout the relevant period. McCreary failed to monitor the Trustees to ensure that the Trustees satisfied the investment duties delegated to the Trustees.

18.     The resulting treatment of participants' cash dividends was highly negligent. At certain times since the start of 2019, the Trustees left millions of dollars' worth of the Plan's dividends in cash deposit accounts designated as "non-interest bearing" (with the remainder in "interest-bearing" cash accounts). The effect of this carelessness was that the Plan's investment earnings on cash between 2019 and 2023 lagged even the interest earned by 3-month treasury bills —the industry standard benchmark for investment earnings on cash products—during the same period. The Plan earned an average of only 1.3% per year on cash between 2019 and 2023, whereas the 3-month treasury bill averaged 1.9%.

19.     But failing to keep the Plan's cash minimally productive in interest-bearing accounts at all times is only the start of Defendants' breach of ERISA's standard of care for

managing employee retirement assets. The Trustees were required to construct a prudent asset allocation policy from the range of investments available to the Plan in the marketplace, after diligent investigation and due consideration of how long the Plan's dividends would be held for investment, the needs of Plan participants, and the objectives of the Plan. The Trustees further needed to continuously monitor the Plan's investments to ensure that the investments remained prudent.

20.     A prudent fiduciary engaging in such a process on behalf of the Plan would not have left all of the Plan's cash dividends in cash accounts from 2019 through the present.

### The Prudent Investor Rule

21.     Under ERISA, fiduciaries must follow the "prudent investor rule" adopted from the law of trusts. *Buccino v. Cont'l Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983) ("[The] common law prudent investor' rule [was] codified by ERISA.").

22.     Pursuant to the prudent investor rule, fiduciaries must invest plan assets in a manner that is "reasonably designed to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain." 29 C.F.R. § 2550.404a-1(b)(2)(i); *see also* Restatement (Third) of Trusts (2007) (hereinafter "3d Rest.") § 90(a) (fiduciaries must pursue "an overall investment strategy[] which … incorporate[s] risk and return objectives reasonably suitable to the trust.").

23.     The prudent investor rule departs from earlier understandings of prudence that overemphasized risk avoidance. *See* 3d Rest. § 90 cmts. a & k.

24.     Rather than avoid risk, fiduciaries must manage risk in pursuit of the objectives of the plan. *See* Max M. Schanzenbach, *et al.* "The Prudent Investor Rule and Market Risk: An Empirical Analysis." Journal of Empirical Legal Studies Volume 14, Issue 1, 129:168, 130 (March

2017) ("The prudent investor rule … reorients trust investment from risk avoidance to risk management[.]").[2]

25.     An appropriate investment strategy suited to the objectives of the plan must consider the time horizons and needs of beneficial investors. *See* 29 C.F.R. § 2550.404a-1(b)(4) ("A fiduciary's determination with respect to an investment" must "us[e] appropriate investment horizons consistent with the plan's investment objectives."); *see also* 3d Rest. § 90 cmt. k ("Asset selection … requires sensitivity to the trust's investment time horizons"). A plan's risk tolerance "largely depends" on how long funds will be held. *Id.* cmt. e(1).

26.     In order to maintain investments that are suited to participants' investment objectives and risk tolerances, a prudent fiduciary must understand the risk and return characteristics of different asset classes.

27.     Stocks generate the highest long-term average returns, although they exhibit the highest short-term volatility. *See* 3d Rest. § 90 cmt. l ("Historically, corporate stocks have provided greater total return over the long term than bonds but ordinarily entail higher risks[.]").

28.     Cash equivalents generate the lowest long-term average returns, but they reduce volatility risk to close to zero. *See id.* ("Returns from these investments have traditionally been relatively low, but their convenience, liquidity, and safety … are especially useful in making modest amounts of trust funds productive for limited periods of time.").

29.     Other assets typically fall in the middle, with the general rule being that bonds of longer duration or lower credit quality will produce higher long-term returns (albeit with higher risk) than bonds of shorter duration or higher credit equality. *See id.*

---

[2]  Available at www.aals.org/wp-content/uploads/2018/02/AM17PrudentInvestorRuleandMarketRisk.pdf.

30.     A prudent fiduciary would have understood these characteristics, which have held

true for more than a century. A recent study found that for 140 years, over any given 10-year

period, more volatile investments in stocks consistently compensated long-term investors with

higher returns and increased buying power, after adjusting for inflation.[3] *See* Òscar Jordà *et al.*,

*The Rate of Return on Everything, 1870-2015*, 134 Q.J. ECON. 1225, 1241–45, 1284–85 (2019).

31.     Conversely, assets invested in cash, despite nominally protecting the principal

amount, are subject to the risk of loss of real buying power if cash returns do not keep pace with

inflation. *Id.* at 1277 (reporting that "negative real rates [on cash] have been relatively common in

modern financial history."). The prudent investor rule specifically warns of the risk of loss of

buying power and the future income caused by investing solely in assets, such as bank deposit

accounts, that do not provide capital growth:

> [T]he trustee should recognize that in inflationary times a high-yield and low-growth
> (or no-growth) investment strategy, adhered to over a long period, would pose a risk
> not only to principal interests but also with respect to … future security; the effects
> of such a strategy would be comparable to a regular practice of invading principal.

3d Rest. § 90 cmt. c.

32.     Whether a fiduciary satisfied its duty is a test of conduct and process. *Id.* cmt.

(e)(1).

### Prudent Reinvestment of Participants' Dividends

33.     A prudent fiduciary considering the risk tolerances, time horizons, and needs of

Plan participants and the objectives of the Plan would have determined that the Plan needed to

pursue a dividend reinvestment policy that seeks capital appreciation. Pursuing a capital

---

[3] The one exception appears to have been looking back 10 years from the middle of the Great
Depression. *See id.* at 1285. Every other rolling 10-year period over 140 years saw a payoff for
growth-oriented investments in stocks and real estate. *See id.*

appreciation strategy required Defendants to reinvest McCreary stock dividends in a diversified pool of publicly traded stocks.

34.    First, employees generally have a long investment time horizon. *See* 72 Fed. Reg. 60452, 60463 (finding that retirement investments made on behalf of employees "ought to and often will be long-term investments"). The tax code and the terms of the Plan encourage or require Plan participants to keep their account balances in the Plan for the long term. Employees may accumulate investment earnings tax free so long as they leave their accounts in the Plan. Conversely, employees are assessed a 10% IRS penalty in most circumstances if they spend their account balances prior to reaching age 59 ½. Moreover, the option to suffer an early withdrawal penalty arises only if the participant is eligible for a distribution under the terms of the Plan, which for most participants who remain employed with McCreary will not occur until they reach age 65.

35.    Accordingly, employees can generally tolerate short-term risk associated with stock market volatility. The more salient risk to participants is the loss of real buying power over the duration of their investment time horizon due to inflation. To tailor the Plan's investment policy to participants' risk tolerances and sensitivities, a prudent fiduciary would have obtained stock market exposure for participants from their unused cash dividends, as investing in stocks is a recognized prudent investment strategy to manage inflation risk. *See* 3d Rest. § 90 cmt. l ("a primary and proper attraction of common stocks is that they offer trustees a hedge against loss of purchasing power").

36.    Second, employees need the dividends earned by their accounts to continue to grow to increase their future income streams in retirement. The objective of retirement plans is to provide retirement income. *See* 87 Fed. Reg. 73822, at 73825 (Dec. 1, 2022) (emphasizing "the interests of the participants and beneficiaries in their retirement income" as the principal concern of ERISA fiduciaries). The average account balance in the Plan and McCreary's 401(k) plan

combined is $116,000, which is not enough on its own to fund participants' retirements. *See* PwC, "Retirement in America: Time to rethink and retool" at 4 (2021) (finding that $120,000 is "hardly enough even without factoring in rising life expectancies and increasing healthcare costs.").[4] Accordingly, to redress participants' retirement savings deficit, a prudent fiduciary would seek not only to maintain the buying power of participants' account balances but to increase their buying power through capital appreciation. The need to increase participants' buying power also calls for stock market exposure. *See* 3d Rest. § 90 cmt. l (investing in stocks is appropriate when a "deliberate effort to increase the real value of the trust estate" is needed).

37.     Third, investing in other stocks is a recognized prudent investment strategy for managing the specific risks that the Plan faces due to its high investment concentration in the stock of a single company. *See* 3d Rest. § 90 cmts. e(1), g, & gen. note to cmts. e–h (describing "specific" or "nonmarket" risk as the risk associated with a single security). Specific risk is reduced by broadening the number and character of securities held in the same class—in this case, stocks. *See id.* cmt g ("[R]isk … is always greater with a single stock than it is with multiple stocks.").[5]

38.     Fourth, the purpose of the Plan is to provide equity returns to participants through partial ownership of the company. Accordingly, when the Plan earns dividends that cannot be reinvested in McCreary stock due to the lack of additional McCreary shares for purchase, a prudent fiduciary would seek replacement equity returns through reinvestment in other stocks.

---

[4] Available at https://www.pwc.com/us/en/industries/asset-wealth-management/assets/pwc-retirement-in-america-rethink-retool.pdf.
[5] An ESOP's investment in company stock is exempt from ERISA's duty to diversify. *See* 29 U.S.C. § 1104(a)(2). This means that an ESOP need not sell off company stock in order to become more diversified. However, if an ESOP accumulates substantial assets other than company stock, as the Plan has done, prudent risk management principles apply to those other assets, and the fiduciary must give appropriate consideration to the portfolio as a whole and the objectives of the plan. *See* 29 C.F.R. § 2550.404a–1(b).

Participants have a separate retirement plan, McCreary's 401(k) plan, in which they control investments and contributions levels and can invest for low volatility if desired. In the Plan, a prudent fiduciary would remain focused on its objective of providing equity returns to participants.

39.     Fifth, a prudent fiduciary would seek market liquidity and low costs by investing in publicly traded stocks through pooled investment funds such as mutual funds. The potential cost and administrative complexity of pursuing a capital appreciation strategy is greatly reduced by using pooled funds that hold public securities, making growth strategies practicable for even relatively small plans that need to be able to invest and settle participant accounts without incurring significant costs or other restrictions. *See* 3d Rest. cmts. h, l.

40.     Sixth, the fact that some participants will retire or otherwise become eligible for distributions from the Plan each year does not change the conclusion that a prudent fiduciary would have sought capital appreciation from unused dividends. Withdrawing from an employer's plan, even due to retirement, is often not the end of the participant's investment horizon, as distributed funds are likely to be held or consumed over a period of years in which capital appreciation is still needed. Moreover, to the extent that participants approaching retirement wish to reduce their volatility risk, the Plan has a built-in mechanism for them to customize their investment strategies. Participants who reach age 55 and have 10 years with the company may begin installment transfers to the McCreary 401k plan, where they can invest in a fixed income product that guarantees their principal balance, or other investments that offer reduced volatility.

41.     Had the Trustees researched and monitored 3-, 5- and 10-year market changes at any point during the relevant period, they would have soon discovered that the Plan needed to reinvest McCreary stock dividends in other stocks to serve the needs of participants. Plan participants do not benefit from short-term volatility protection while their dividends sit in deposit

accounts for years. But participants lose real buying power due to inflation, and substantial

opportunity for gains, due to the lack of reinvestment in stocks.

**Illustration A: 3-Year Annual Averages[6]**

|  | **2018** (2016–2018) | **2019** (2017–2019) | **2020** (2018–2020) | **2021** (2019–2021) | **2022[7]** (2020–2022) | **2023** (2021–2023) |
|---|---|---|---|---|---|---|
| **Stocks** | 8.92% | 14.52% | 14.41% | 25.72% | 6.89% | 8.43% |
| **Inflation** | 1.94% | 2.13% | 1.83% | 2.57% | 4.61% | 5.59% |
| **Cash** | 1.02% | 1.67% | 1.61% | 0.99% | 0.72% | 2.15% |

**Illustration B: 5-Year Annual Averages**

|  | **2018** (2014–2018) | **2019** (2015–2019) | **2020** (2016–2020) | **2021** (2017–2021) | **2022** (2018–2022) | **2023** (2019–2023) |
|---|---|---|---|---|---|---|
| **Stocks** | 7.86% | 11.18% | 15.36% | 17.92% | 8.65% | 15.05% |
| **Inflation** | 1.52% | 1.56% | 1.77% | 2.46% | 3.61% | 3.94% |
| **Cash** | 0.63% | 1.07% | 1.20% | 1.14% | 1.26% | 1.88% |

**Illustration C: 10-Year Annual Averages**

|  | **2018** (2009–2018) | **2019** (2010–2019) | **2020** (2011–2020) | **2021** (2012–2021) | **2022** (2013–2022) | **2023** (2014–2023) |
|---|---|---|---|---|---|---|
| **Stocks** | 13.22% | 13.43% | 13.74% | 16.24% | 12.03% | 11.40% |
| **Inflation** | 1.56% | 1.77% | 1.73% | 1.89% | 2.46% | 2.73% |
| **Cash** | 0.37% | 0.58% | 0.64% | 0.63% | 0.76% | 1.25% |

42. Pooled investment funds with established track records that offer broad exposure to

the stock market and daily liquidity were readily available to the Trustees to invest in on behalf of

---

[6] Stock market and cash returns are represented by the following broad-based securities indexes: Stocks – Dow Jones US Total Stock Market; Cash – 3-Month Treasury Bill. Inflation rates are per the Federal Reserve Bank: https://fred.stlouisfed.org/series/FPCPITOTLZGUSA.
[7] The year 2022 is notable because stocks were down 20% on the year, but the stock market's 3-, 5- and 10-year averages remained substantially higher than both cash earnings and the rate of inflation.

the Plan at minimal cost during the relevant time, had the Trustees engaged in a prudent process. Neither special skill with respect to manager selection, nor keen insight with regard to management style, was needed in order for the Plan to obtain stock market returns from participants' unused dividends. Dozens of mutual funds sold by numerous firms employing an array of investment styles generated average annual returns, net of fees, within around 1% per year of the stock market as a whole between 2019 and 2023. A prudent fiduciary would have selected from among such options for the reinvestment of the Plan's dividends.

**Share Recycling**

43.     Defendants' practice of leaving excess dividends in cash accounts is not excused by the Plan's possible repurchase and reallocation of shares when participants leave the Plan. Distributing departing participants' share values in cash from an ESOP and then reallocating their shares to current participants is called "recycling."

44.     Plaintiff lacks information regarding whether Defendants, in fact, considered possible share recycling in relation to their management of the Plan's cash dividends.  Plaintiff does not allege or infer that Defendants engaged in such a process. Any claim by Defendants that they did consider possible share recycling in connection with their investment decisions would need to be made affirmatively by Defendants and be subject to discovery.

45.     If Defendants do assert that their dividend reinvestment decisions were guided by concern for possible share recycling, Defendants managed those decisions imprudently in breach of their fiduciary duties under 29 U.S.C § 1104(a)(1).

46.     An ESOP's assets do not need to be held in cash accounts in order to be available for share recycling. Had the Trustees reinvested McCreary stock dividends in stock mutual funds that provide daily liquidity (see *supra* ¶¶ 39, 42), any amount of the Plan's mutual fund balance would have been available to convert to cash on demand to fund recycling transactions. If

Defendants left the Plan's dividends in cash accounts because they believed that only cash accounts provided daily liquidity, that belief was incorrect and imprudent and violated ERISA's standard of care.

47. If Defendants knew that stock mutual funds provided daily liquidity but were concerned that stock mutual fund holdings would lose value before the anticipated recycling transactions, that is a time horizon question. The Trustees needed to consider whether and when the Plan's non-McCreary stock assets might be used to recycle shares and the risks associated with the investment strategies available in the interim, given the time horizon.

48. For example, if the Trustees held a sum of cash dividends certain to be used to recycle shares in 3 months, the volatility risk associated with reinvesting the dividends in stock mutual funds in the interim (*i.e.*, the risk that dividends reinvested in stock mutual funds would be exchanged for less than current value in 3 months due to stock market volatility) would call for a capital preservation strategy.

49. Alternatively, if the Trustees did not expect use a sum of cash dividends for 3 years or longer, the Plan could tolerate monthly volatility associated with reinvesting in stock mutual funds, but the Plan would face near certain loss of opportunity for capital appreciation, and loss of real buying power, if that sum remained in cash. *See supra, Illus. A–C.* This outlook, of which a prudent fiduciary monitoring asset performance and inflation would have been aware, would call for a capital appreciation investment strategy. *See id.*

50. In ESOPs such as the Plan that hold private company stock, a plan fiduciary must utilize a competent repurchase study, or similar analysis, in order to give appropriate consideration to the time horizon and risks that apply to the reinvestment of other ESOP assets. A repurchase study is typically prepared by a professional advisor to help the sponsor company and the ESOP develop a financial plan for funding cash payments to participants as they become eligible to

liquidate their shares of company stock. The repurchase analysis bears substantially on the investment time horizon for non-employer stock assets that the ESOP holds or may accumulate over time.

51.     A repurchase study estimates the amounts needed to repurchase participant shares as they exit the ESOP. The repurchase study looks at the withdrawal terms of the plan; participant ages, stock holdings, and employment statutes; the projected price of company stock, and other factors to estimate the cost of participant share liquidations that will occur each year in the future.

52.     The repurchase study also estimates future income available to fund participant share repurchases. This analysis includes projected company earnings, the history of contributions and dividends paid to the ESOP, and projected investment earnings.

53.     Estimates regarding future repurchases and income allow the sponsor company and the ESOP to develop a financial plan to fund repurchases. There are multiple options concerning how to fund repurchases, including whether the cash used in repurchase transactions will be sourced from the company or the ESOP.

54.     The company that sponsors the ESOP—and not the ESOP itself—is legally obligated to plan participants to repurchase their shares when they become eligible to receive a distribution of their account. *See* 26 U.S.C. § 409(h)(1)(B); 29 C.F.R. § 2550.408b-3(j). If a company satisfies its repurchase obligation directly, the company supplies the cash for the transaction, and the company may then reissue or resell the repurchased shares to the ESOP or another party, cancel them, or hold them in reserve.

55.     Alternatively, the ESOP may repurchase shares from eligible participants. The cash for the transaction is drawn from other ESOP participants' accounts, and the ESOP reallocates the repurchased shares to the participants whose accounts provided the cash. Recycling transactions

are voluntary for the ESOP. Whether to use ESOP assets to complete recycling transactions is a fiduciary act that must be taken only if it is interest of participants.

56.     Given that the company or the ESOP may fund repurchases, business and fiduciary decisions are necessarily intertwined. If the company does not repurchase shares directly, that creates a repurchase opportunity for the ESOP. But if the ESOP declines or fails to repurchase the shares, the company becomes liable to complete the transaction.

57.     Because it is often in the interest of ESOP participants to have the ESOP reallocate departing participants' shares, yet it exposes the company to risk if the ESOP declines or fails to complete the repurchases, it is typical for ESOP sponsors to set aside at least enough company earnings to fund the expected repurchases each year, while also providing the ESOP the opportunity to use those funds to make the repurchases if desired. The funds are transferred to the ESOP as contribution or dividend income and then promptly paid to departing participants for their shares, which are then reallocated to current participants. If the Plan has an accumulated balance of non-employer stock assets, those assets are not needed to considered as part of the recycling process.

58.     A sponsor company that desires all departing participant shares to be reallocated to current participants may also repurchase the shares using funds set aside by the company and then transfer the shares back to the ESOP as contributions or dividends.

59.     Given that repurchases are a corporate liability, yet there are multiple options to have the ESOP retain and reallocate shares if desired, it is unnecessary and uncommon for a sponsor company to rely on the ESOP to fund repurchases solely or substantially from a long-term pool of assets held by the ESOP.

60.     Repurchase studies are typically updated every year to account for any changes to projections.

61.    A prudent ESOP fiduciary would evaluate the repurchase study or equivalent analysis in order to make careful and informed judgments concerning the reinvestment of cash earned by the ESOP. The ESOP fiduciary must compare the plan's asset schedule and income to the company's repurchase strategy to understand whether any cash on the plan's balance sheet is transient cash intended for imminent share repurchases; whether any cash is part of the company's repurchase strategy but not expected to be used until a later date; and whether any cash is not expected to be used for repurchases at all. A prudent ESOP fiduciary also must ensure that the repurchase analysis was competently performed before relying on it.

62.    The actual amount of share repurchases transacted by the Trustees in any given year is not knowable to Plaintiff prior to discovery. The amount of share repurchases is not itemized in the Plan's annual reports to the DOL. Plaintiff did not receive that information from the Plan. Share repurchases are part of total distributions paid by the Plan—a sum that is reported annually to the DOL—but the reported sum of total distributions also includes the portion of departed participants' accounts that was always held in cash (*i.e.*, their unused dividends). The split of participant distributions between share liquidations and accumulated dividends in any given year is known only to Defendants and their agents at this stage, and Plaintiff has no means of obtaining that information without discovery.

63.    Plaintiff also has no means of accessing any repurchase studies that were prepared or relied upon by Defendants in relation to the Plan. Any analysis, conclusions, and strategies with respect to repurchases that may have been formed or communicated between McCreary and the Trustees are not knowable to Plaintiff until discovery. These records, and the degree of competence and diligence with which they were prepared and utilized, are likely to bear on whether Defendants knew or should have known that the Plan's accumulated dividends would not be expended on share repurchases in whole or substantial part for at least 5 years and would

consequently lose buying power and the opportunity for capital appreciation unless prudently invested.

64.     Notwithstanding Plaintiff's lack of access to the precise repurchase amounts or any repurchase studies and related communications prior to discovery, the information available at this stage gives rises to the reasonable inference that Defendants failed to engaged in a prudent risk management process with respect to the Plan's accumulated dividends and possible share repurchases.

65.     The Plan's cash flows, allowing for reasonable estimates of share repurchases, show that the Plan has funded repurchases substantially if not entirely through new dividends since 2019, while unused dividends from prior years have remained in cash for upwards of 5 years.

66.     This outcome was predictable to Defendants in 2019 and on an ongoing basis since 2019. The withdrawal terms of the Plan and earnings projections used by the Plan would have demonstrated to a prudent fiduciary that the Plan had far more accumulated earnings than it could spend on near-term repurchases. A prudent fiduciary would have known that the Plan was inviting near certain loss of buying power and loss of opportunity for capital appreciation by leaving all non-McCreary stock assets in cash during this period.

**Illustration D: Plan Cash Flows, 2019–2023[8]**

| | Cash Balance on January 1 | Cash Received from Company[9] | Interest on Cash | Estimated Share Repurchases[10] | Estimated Cash Account Distributions[11] | Admin Expenses | Cash Balance on December 31 |
|---|---|---|---|---|---|---|---|
| 2023 | $13.00mm | $6.11mm | $0.62mm | $7.68mm | $2.04mm | $0.09mm | $9.92mm |
| 2022 | $15.60mm | $1.57mm | $0.12mm | $2.95mm | $1.28mm | $0.08mm | $13.00mm |
| 2021 | $15.95mm | $4.55mm | $0.04mm | $3.71mm | $1.15mm | $0.07mm | $15.60mm |
| 2020 | $15.82mm | $4.54mm | $0.01mm | $3.37mm | $0.99mm | $0.06mm | $15.95mm |
| 2019 | $8.44mm | $10.57mm | $0.02mm | $2.66mm | $0.49mm | $0.08mm | $15.82mm |

67.    While Plaintiff lacks the employee records and Plan transaction data necessary to estimate repurchases in advance or know the precise amounts transacted in the past, and must rely on reasonable estimates of past repurchase based on total distributions and the ratio of cash to McCreary stock in the Plan (*see supra* ¶ 62 & notes 10–11), to the Defendants repurchases are predictable 10 years in advance. This is because the withdrawal terms of the Plan call for a 5-year waiting period before the company is obligated to repurchase shares from separated employees, after which the employee is entitled to distribution of only 1/5 of their balance per year over the next 5 years. Defendants have the ability to project future repurchase amounts based on when

---

[8] Values are stated in millions (mm) and rounded to the nearest $10,000. Due to rounding, starting balances and cash flows may not sum exactly to year-end balances.

[9] Cash received from the company in a given year includes the amount of new cash that the Plan received from the company during the year on account (1) dividends declared and collected by Plan during the year; (2) dividends declared in prior years and collected by the Plan during the year; and (3) other contributions from the company. The vast majority of positive cash flows to the Plan are dividends. Contributions are small amounts that appears to be calculated to cover the Plan's administrative expenses.

[10] Share repurchases are estimated to be the amount of total distributions paid by Plan during the year multiplied by the percentage of total plan assets represented by McCreary stock at the end of the prior year.

[11] Cash account distributions are estimated to be the amount of total distributions paid by Plan during the year multiplied by the percentage of total plan assets held in cash at the end of the prior year.

participants left the company and the projected price of McCreary stock, which is valued annually by Defendants based on earnings and includes built-in projections of growth (*see infra* ¶ 70).

68.     Participants who are at or near retirement have additional liquidity options for their McCreary shares, but repurchases from these participants are also predictable in advance to Defendants based on employee age and tenure. A participant must reach age 65 to be eligible for a lump sum distribution, and only participants age 55 and older with 10 years of service are eligible for partial transfers to the McCreary 401(k) plan. A prudent review of McCreary's employee census data would have identified participant balances eligible for elective liquidation each year in the future. Additionally, it is typical for fiduciaries to consider the expected rate at which eligible participants will request lump sum distributions or 401(k) transfers based on past experience or industry averages, and the same should have been done by Defendants here.

69.     Between the waiting period for separated employees and the age and tenure limits for additional liquidity, the amount of repurchases transacted by the Plan each year since 2019 was foreseeable to Defendants in 2019 and on an ongoing basis since 2019.

70.     New income to apply to repurchases was also predictable to Defendants. The company has consistently produced dividends for shareholders during the life of the Plan. The Plan paid off the promissory note used to acquire McCreary stock 2 years early in 2015 because McCreary paid annual dividends and contributions to the Plan in excess of the minimum amounts needed to fund the note payments and all other expenses of the Plan. After the note was paid off, McCreary continued to pay substantial dividends to the Plan, including $5.9 million in both 2016 and 2017, followed by another $5.9 million dividend declared in 2018 and paid in 2019 (in addition 2019 dividends). As a 30% shareholder in the company alongside the McCreary family— who control the company at the executive and board levels—the Plan may reasonably expect to

receive dividends as a natural consequence of the McCreary family wanting to pay dividends to themselves.

71.     The company's forward-looking projections also supported a reasonable expectation of continued dividends. The Plan's valuation advisor has consistently relied on the capitalization of earnings method to value the Plan's McCreary stock, including in each year since 2019. The capitalization of earnings method is most typically used when "current and relatively recent cash flows are good indicators of what your company will do in the future." *See* National Center for Employee Ownership, *The Inside ESOP Fiduciary Handbook* at 59–60 (4th Ed.) (2000). Based on the company's expectation of consistent earnings, combined with the company's history of using its earnings to pay dividends to shareholders, it was predictable to Defendants throughout the relevant time that the Plan would continue to receive substantial dividends to apply to share repurchases.

72.     Additionally, the company's overall projected profitability dispelled any notion that the Plan's accumulated cash was needed in the event that share liquidations greatly exceeded expectations, as the company has remained in strong position to satisfy it repurchase liabilities.[12]

73.     Given the Plan's excess cash balance as well as projected income and repurchases during the relevant time, a prudent fiduciary would have identified inflation risk and the risk of inadequate earnings to support their retirement goals to be the principal investment risks faced by Plan participants with respect to the cash dividends accumulated in their accounts between 2019 and the present. For the all the reasons discussed above (*see supra* ¶¶ 34–42), a prudent reinvestment strategy focused on investing in stocks through pooled investment funds should have

---

[12] Although the full valuation reports are not available to Plaintiff prior to discovery, the share prices and capitalization rates disclosed in the Plan's annual reports to the DOL imply that the company has consistently projected net earnings within the range of $15 million and $25 million per year.

been implemented for the Plan's excess cash in 2019 and maintained through the present. By failing to reinvest excess dividends and exposing Plan participants to loss of buying power and loss of opportunity for capital appreciation, Defendants violated ERISA's standard of prudence.

**Losses to the Plan**

74.     The Plan and its participants suffered extensive losses resulting from Defendants' imprudence. Between 2019 and 2023, the Plan earned an average of 1.3% per year on its cash holdings. If the Plan has continued to hold cash through the present at market rates of interest, the Plan's average annual earnings since 2019 are now around 2.0%.

75.     To determine the Plan's losses, "the court must determine what asset mix a prudent fiduciary would have maintained," and then calculate what those investments would have earned relative to the Plan's cash holdings. *See Meyer v. Berkshire Life Ins. Co.*, 250 F. Supp. 2d 544, 573 (D. Md. 2003), *aff'd*, 372 F.3d 261 (4th Cir. 2004).

76.     Considering the Plan's purpose as McCreary's stock plan, participants' lack of retirement readiness, the time horizon for reinvestment of the Plan's excess cash dividends, participants' risk of loss of real buying power during that time, and participants' specific risk associated with the Plan's concentration in McCreary stock, a prudent fiduciary would have invested the Plan's excess cash in a diversified pool of publicly traded stocks through a pooled investment fund. Had Defendants done so, participants would have earned around 16.5% per year or more, on average, on their unused dividends since 2019. This translates to a dollar loss of around $17.5 million, or around $15,000 per participant.[13]

77.     The Plan and its participants are likely to incur additional losses unless and until Defendants implement a prudent reinvestment strategy for the Plan's unused dividends. The Plan's losses will be updated at the time of trial.

_____

[13] Through year-end 2023, the loss amount was $12.7 million.

## PLAINTIFF'S LACK OF ACTUAL KNOWLEDGE

78.     Plaintiff lacked knowledge of material information to support his claims until recently. Plaintiff was not aware of the processes engaged in by Defendants in determining the investment strategy for his account or the Plan as a whole, or Defendants' monitoring of the Plan's investments and investment strategy. Plaintiff's allegations are based on inferences drawn from the facts adduced to date and are made upon information and belief and in reliance on the investigation of counsel.

## PLAN-WIDE RELIEF

79.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiff seeks recovery on behalf of the Plan pursuant to this statutory provision.

80.     Plaintiff seeks recovery for injuries to the Plan sustained as a result of fiduciary breaches and seeks equitable relief on behalf of the Plan as a whole pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2)–(3).

81.     Plaintiff is adequate to bring this derivative action on behalf of the Plan, and his interest is aligned with other participants and beneficiaries. Plaintiff does not have any conflicts of interest with any participants or beneficiaries that would impair or impede his ability to pursue this action. Plaintiff has retained counsel experienced in ERISA litigation and intends to pursue this action vigorously on behalf of the Plan.

## CLASS ACTION ALLEGATIONS

82.     Plaintiff additionally and alternatively seeks certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

83.     Plaintiff asserts his claims on behalf of a class of participants and beneficiaries of the Plan defined as follows:

All participants in the Plan since the date that is six years prior to the date on which this action was filed, along with their beneficiaries and alternate payees of record, excluding the Trustees and any participants who exercised any discretion or control on behalf of Defendants concerning how to invest Plan assets.

<u>Numerosity</u>: The Class is so numerous that joinder of all Class members is impracticable. The Plan has more than 1,000 participants.

84.    <u>Typicality</u>: Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff was a Plan participant and Plaintiff suffered injuries as a result of Defendants' violations of ERISA. Defendants treated Plaintiff consistently with other Class members with regard to the Plan. Defendants' improper actions affected all Plan participants similarly.

85.    <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with the Class that he seeks to represent, and he has retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiff does not have any conflicts of interest with any Class members that would impair or impede his ability to represent such Class members.

86.    <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

a.    Whether Defendants were fiduciaries with respect to the Plan and the scope of their fiduciary duties;

b.    Whether Defendants failed to comply with the ERISA fiduciary standard of prudence in violation of 29 U.S.C. § 1104(a)(1);

c.    Whether the Plan suffered losses as a result of Defendants' fiduciary breaches;

d.    The proper form of equitable and injunctive relief; and

e.    The proper measure of monetary relief.

87.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

88.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court would be dispositive of the interests of all participants.

89.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this pleading applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of prosecuting claims of this nature. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' actions. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

90.     Plaintiff and his undersigned counsel will provide notice to the class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court.

## COUNT I

### 29 U.S.C. § 1104(a)(1) & 29 U.S.C. § 1105(a)

91.     Plaintiff incorporates the foregoing paragraphs by reference.

92.     Defendant Trustees is the Plan's governing board with discretion concerning how participants accounts are invested.

93.     The Trustees violated ERISA fiduciary standards set forth in 29 U.S.C. § 1104(a)(1) by failing to monitor, investigate, or implement a prudent reinvestment strategy for the Plan's unused dividends. The Trustees did not competently consider the time horizons and risks associated with the Plan's accumulated cash dividends and failed to pursue an appropriate reinvestment strategy consistent with Plan participants' interests, needs, and objectives, or the purpose of the Plan. The Trustees failed to monitor the Plan's investment in cash accounts and replace that investment due to its imprudence.

94.     Defendant McCreary failed to monitor the Trustees and failed to take action to remedy the Trustees' abdication of its investment duties. Defendant McCreary had the authority and the duty to remove the Trustees and appoint a competent investment manager on behalf of the Plan. Defendant McCreary failed to take these necessary actions to protect the interests of Plan participants.

95.     Defendants enabled and failed to remedy each other's breaches in violation of 29 U.S.C. § 1105(a).

96.     Defendants' violations of 29 U.S.C. §§ 1104(a)(1) and 1105(a) caused the Plan injury in the form of lost investment earnings, and Defendants' deficient fiduciary conduct threatens future harm to the Plan of the same character. These injuries to the Plan adversely affected Plaintiff's Plan account.

25

97.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), Plaintiff, the Plan, and the

Class are entitled to recover losses caused by Defendants' violations of 29 U.S.C. §§ 1104(a)(1)

and 1105(a) and other equitable and injunctive relief.

## PRAYER FOR RELIEF

98.     Wherefore, Plaintiff prays for judgment against Defendants and for the following

relief:

A.      Certify Plaintiff's authority to seek plan-wide relief on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2);

B.      Alternatively, certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify Plaintiff as the class representative, and certify his counsel as class counsel;

C.      Order Defendants to make good to the Plan all losses resulting from their violations of ERISA;

D.      Impose equitable and injunctive relief sufficient to protect Plan participants, including changes to Defendants' investment process and/or removal of Defendants from fiduciary positions and appointment of independent investment advisors and managers;

E.      Appoint an independent fiduciary to collect, allocate, and distribute to participants any monies recovered on behalf of the Plan pursuant to a fair and reasonable plan of allocation;

F.      Award Plaintiff reasonable attorneys' fees and costs incurred pursuant to 29 U.S.C. § 1132(g), and/or pursuant to the common fund method;

G.      Award prejudgment and post-judgment interest; and

H.      Award such other and further relief as the Court deems just and equitable.

Respectfully Submitted,

Dated: January 17, 2025

/s/ Daniel R. Francis
Daniel R. Francis, NC Bar No. 44131
Attorney for Plaintiff
DAN FRANCIS LAW FIRM PLLC
P.O. Box 575
Lexington, NC 27293
Office: 336-300-8049

Mobile: 314-258-0259
Fax: 866-751-3933
Dfrancis@DanFrancisLawFirm.com

Carl F. Engstrom, MN Bar No. 0396298*
Jennifer K. Lee, MN Bar No. 399012*
Attorneys for Plaintiff
ENGSTROM LEE LLC
323 N. Washington Ave., Suite 200
Minneapolis, MN 55401
Telephone: (612) 293-7843
Facsimile: (612) 677-3050
cengstrom@engstromlee.com
jlee@engstromlee.com

*pro hac vice application forthcoming*